# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

SHAQUELA HOLLY,

      Plaintiff,

                          CASE NO. 18-12317

v.                            HON. DENISE PAGE HOOD

BEAUMONT HEALTH and
BOTSFORD GENERAL HOSPITAL,

      Defendants.

_____/

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [ECF No. 21]

## I.    INTRODUCTION

On July 24, 2018, Plaintiff Shaquela Holly filed a four-count Complaint alleging that Defendants discriminated against her on the basis of her pregnancy, in violation of Title VII and the Michigan Elliot-Larsen Civil Rights Act ("ELCRA"), and on the basis of her disability, in violation of the Americans with Disabilities Act ("ADA") and the Michigan Persons with Disabilities Civil Rights Act ("PWDCRA"). On September 26, 2019, Defendants filed a Motion for Summary Judgment. [ECF No. 21] The Motion has been fully briefed. For the reasons that follow, the Court grants in part and denies in part the Motion for Summary Judgment.

## II.    STATEMENT OF FACTS

1

Plaintiff began her employment at Defendant Botsford General Hospital ("The Hospital") as a contingent Occupational Therapist on November 16, 2012. ECF No. 23, Ex. A, at 15; Ex. B.[1] Plaintiff provided education and performing rehabilitative exercises for The Hospital's patients regarding safe home discharges upon a doctor's recommendation. Ex. C, at 47. As a "Regular Casual" employee, Plaintiff was required to work at The Hospital two weekends a month, and two holidays or holiday weekends per year, but "always picked up extra [hours] during the week." Ex. A, at 16; Ex. C, at 42. Plaintiff reported directly to Team Lead Helene Rose ("Rose"), who consistently gave Plaintiff positive performance reviews. Ex. E.  Merlin Francis ("Francis"), the Manager of the Physical Medicine and Rehabilitation ("PW&R") department, Ex. A, at 11-12; Ex. F, described Plaintiff as "one of the best employees we have there," stating that Plaintiff had excellent attendance, was reliable, Ex. A, at 56, and that "We all liked her. She was great with the patients." Ex. G, at 55.

In the spring of 2017, Plaintiff became pregnant with her fourth daughter. On March 9, 2017, when Plaintiff became aware that her pregnancy was considered high-risk, she confidentially emailed Francis asking that Plaintiff be switched from "Regular Casual" to "Flex Casual," effective on April 1, 2017. Ex. A, at 18; Ex. J; Ex.

---

[1] Unless designated otherwise, all citations in this Statement of Facts section are taken from ECF No. 23.

C, at 105; Ex. K. On May 1, 2017, Plaintiff requested a medical leave of absence for her high-risk pregnancy. Ex. H, at 29; Ex. A, at 25. The May 1, 2017 email and attached doctor's note explained that Plaintiff has been advised by her physician to take off work immediately in preparation for delivery on August 28, 2017. Ex. H, at 29; Ex. L. Francis forwarded this email to Rose, attaching Plaintiff's doctor's note as her "medical leave approval." Ex. A, at 33. Ex. M.

In 2017, Beaumont Health Systems and Oakwood Hospital merged with The Hospital to form Defendant Beaumont Health ("Beaumont"). Ex. H, at 10. In the summer of 2017, The Hospital's procedure for requesting a leave of absence transitioned to a new procedure involving computer software systems PeopleSoft and UltraPro. Ex. H, at 19, 40, 94. The transition resulted in internal communication gaps in the leave of absence reporting system. Ex. H, at 93-94. For more than six months in 2017, no Leave of Absence reports were distributed to departments. *Id.*; Ex. I.

According to The Hospital's Leave Administrator Sharon Burke-Thomas ("Thomas"), Plaintiff's leave of absence procedure did not work as it should have. Ex. H, at 27. If The Hospital had been able to follow the new leave procedure on May 1, 2017, Francis would have first initiated the leave in PeopleSoft upon receiving Plaintiff's May 1, 2017 email, then the software would have sent an invitation to Thomas to mail a non-FMLA packet ("packet") to Plaintiff's home address. *Id.*; Ex.

3

N. The packet would contain the Department of Labor's medical certification to be completed by the employee's physician, a leave request form that the employee would fill out, and Thomas' business card with fax and email information of where Plaintiff would need to send the completed forms to the Human Resources ("HR") department. Ex. H, at 21. Because Plaintiff's leave started before this new software system was officially implemented, however, there was no written policy that advised employees regarding requesting time off or submitting necessary paperwork. Ex. H, at 40; Ex. A, at 28. The packet, with the necessary forms for Plaintiff's leave of absence, was not sent to Plaintiff in May 2017. Ex. H, at 21-22.

Plaintiff gave birth to her daughter on August 25, 2017, Ex. C, at 108, but she suffered a pubis symphasis separation/strain giving birth. *Id*. Plaintiff texted Rose that she gave birth and communicated to Rose the pregnancy-related complications she was experiencing. *Id*. Rose understood Plaintiff to be out on medical leave due to pregnancy-related issues through September 2017. Ex. G, at 26, 46; Ex. O. Even though the PeopleSoft procedure was completely in place by September, it is undisputed that Rose failed to contact anyone in HR about Plaintiff or request a medical certification from Plaintiff. On October 10, 2017, Francis asked Rose to email Plaintiff, relaying that the HR department was seeking Plaintiff's return to work date for "scheduling" purposes, so that Plaintiff did not get "kicked out of the system."

4

Ex. A, at 39-41.  Rose emailed Plaintiff on October 10, 2017 asking about Plaintiff's return date. Ex. A, at 41-42; Ex. P. Plaintiff replied to Rose that she did not have a return date yet, but she was going to the doctor the next day, and she may have to go to physical therapy. Ex. A, at 41; Ex. P.

In October 2017, Rose also asked Plaintiff about her completion of mandatory LMS Modules (required online courses for employees that included quizzes) while on medical leave, with knowledge that Plaintiff was still using a walker and crutches due to her pregnancy-related complication. Ex. G, at 28, 47-48; Ex. P; Ex. R. Plaintiff asked Rose for clarification about what Plaintiff needed to complete. Ex. G, at 33; Ex. P.  On October 13, Rose emailed Plaintiff that Plaintiff could complete the modules at home, Ex. A, at 45; Ex. G, at 36-38; Ex. Q, even though that advice contravened The Hospital's policy (and Francis' understanding) that if someone is out on leave, the LMS modules need not be completed until the employee returns to work. Ex. A, at 49.

Plaintiff completed the LMS modules at home while suffering from her pregnancy-related condition, spending three hours and 18 minutes over two days on them. Ex. C, at 115. Ex. R. After Plaintiff completed the LMS modules, Rose told Plaintiff via text message that, "I just spoke with [Francis] and I cannot pay you to do LMS at home because you punch." Ex. A,  at 49; Ex. G, at 38-39; Ex. R. Plaintiff

emailed Francis about the situation on October 26, 2017, voicing her frustration about not being paid for work she was instructed to do while out on leave. Ex. A, at 53; Ex. S. Francis forwarded Plaintiff's email to Rose, stating "don't share the email with anyone." Ex. A, at 54; Ex. S. On October 27, 2017, Francis emailed Plaintiff to "please call" her about the miscommunication about the LMS Modules. Ex. A, at 57, 59. Ex. T. During this conversation, Francis yelled at Plaintiff, hardly giving her a chance to speak. Ex. C, at 116. Plaintiff told Francis that she needed to use a walker and was using crutches due to her post-pregnancy complications. Ex. A, at 60; Ex. C, at 119. At no point during this phone conversation did Francis ask Plaintiff for the medical certification in order to extend Plaintiff's leave. Ex. C, at 119.  Plaintiff was eventually paid for completing the LMS modules. *Id*.

On November 8, 2017, Plaintiff sent an email to Ryan Kuhn in HR that, because of pregnancy-related complications, Plaintiff's doctor advised that she could return to work on January 1, 2018. Ex. H, at 23-24; Ex. C, at 121; Ex. U; Ex. V.  A doctor's note was attached to that email, and Plaintiff believed it extended her leave of absence. Ex. C, at 122.  Thomas took action concerning Plaintiff's leave for the first time, as she was not previously aware that Plaintiff was pregnant in 2017. Ex. H, at 22, 34.  Francis asked Thomas "how long we can keep [Plaintiff's] position open." Ex. A, at 70-71; Ex. W. Unable to find any documentation of Plaintiff's leave besides

6

Plaintiff's May 1, 2017 email and doctor's note, Thomas advised Francis to input the leave of absence into PeopleSoft and backdate Plaintiff's leave start date as May 1. Ex. H, at 35; Ex. X. Francis could not backdate the leave start date in PeopleSoft, so Francis recorded Plaintiff's leave into PeopleSoft, effective November 8, 2017. Ex. H, at 37. Ex. X.  As Plaintiff's leave was officially initiated, Thomas could mail the leave packet to Plaintiff's home. Ex. H, at 43-44; Ex. Y.

On November 9, 2017, just one day after the Leave Administrator became aware that Plaintiff was extending her leave, Thomas asked Francis if Francis was going to post Plaintiff's position. Ex. A, at 73. Francis replied that she would post Plaintiff's position by the week of December 1, 2017. *Id.*; Ex. W  Plaintiff did not receive the leave packet in the mail until December 7, 2017. Ex. H, at 48; Ex. C, at 124; Ex. Z.

On December 8, 2017, Plaintiff emailed Francis that Plaintiff received the packet the day before and asked Francis for the correct fax number or email address to send the leave request form to The Hospital. Ex. H, at 45-47; Ex. Z. Thomas provided the fax number to Plaintiff, and seven minutes later, Plaintiff emailed the completed leave request form. Ex. C, at 125; Ex. H, at 48. Plaintiff also emailed Thomas, asking if it was necessary to send the medical certification form because The Hospital already had record of her November 8, 2017 doctor's note. Id.; Ex. AA.

Thomas never answered Plaintiff's email regarding the need to send a medical certification form. Ex. H, at 48.  Thomas emailed Plaintiff on December 11, 2017, stating that Thomas could not open the attached leave request form. Ex. H, at 54; Ex. Z. Plaintiff resent another leave of absence form to HR the same day. Ex. H, at 55.

Thomas did not request a medical certification form from Plaintiff when it did not accompany the leave of absence request form. Ex. H, at 53-55.  On December 20, 2017, Thomas sent an email to Plaintiff and several other employees that, because Plaintiff's medical certification was due within 15 days after the leave of absence request was received, Plaintiff's leave was considered denied. Ex. H, at 65-67; Ex. BB. Timothy Holly, Plaintiff's husband, sent a fax  to The Hospital's HR Department on December 20, 2017 with another copy of the leave request form, and it was received on December 21, 2017. Ex. H, at 56; Ex. CC.[2]

On January 2, 2018, Thomas called Plaintiff to notify Plaintiff that The Hospital posted Plaintiff's position because Plaintiff did not send a medical certification form. Ex. C, at 126.  Plaintiff asked Thomas if posting her job meant that Plaintiff was

_____

[2]Thomas subsequently wrote on this exhibit, "termed 1/02/18," because according to Thomas, under The Hospital's policy, employees that are on leave for over six months will be terminated. Ex. H, at 56-59; Ex. DD. No warning about this "six month policy" was communicated to Plaintiff. Ex. H, at 62-63.

losing her job, to which Thomas responded that she was not being terminated.[3] Ex. H, at 78; Ex. C, at 128-129. Plaintiff asked Thomas if posting her job had anything to do with requesting payment for the completion of the LMS modules, Ex. C, at 129, but Thomas did not answer that question. *Id*. at 140. Plaintiff told Thomas that she was still using crutches due to her pregnancy-related complication but had a doctor's appointment the following day, so she could quickly get the proper documentation to Thomas. *Id*. Thomas said "okay" but did not ask Plaintiff to submit a medical certification form. Ex. C, at 127. There are no dates, log entries, or records of this call, which Thomas normally kept in her regular job duties. Ex. H, at 52.

Thomas emailed Francis on January 4, 2018 that: "I did tell [Plaintiff] that her position is being posted… In any event, she has a doctor appointment coming up and will get the paperwork to me as soon as possible." Ex. H, at 78-79; Ex. EE. The email does not indicate that Thomas told Plaintiff that she had to submit a medical certification form. Ex. H, at 80-81. Upon receiving Thomas' January 4, 2018 email, Francis understood Plaintiff's upcoming doctor's appointment as Plaintiff's intent to extend her leave. Ex. A, at 84.

_____

[3]Thomas and Francis maintain that posting Plaintiff's job was not terminating her, even though Rose understood "posting" to mean termination, and Plaintiff was terminated two days after her job was posted. Ex. H, at 72. Ex. A, at 87. Ex. G, at 64.

Plaintiff's physician, Dr. Jackson from Rehabilitation Physicians P.C., assessed Plaintiff on January 3, 2018.  Dr. Jackson determined that Plaintiff was unable to resume work until February 5, 2018, wrote a doctor's note, and completed and attached a medical certification form. Ex. H, at 86.  Timothy Holly faxed these materials to The Hospital on or about January 4, 2018. Ex. C, p 130; Ex. FF; Ex. H, at 85; Ex. GG.

On January 4, 2018, Francis sent an email to Dalph Watson ("Watson"), the Director of the HR Department, explaining that because Plaintiff had a high-risk pregnancy, Plaintiff was not ready to come back to work, and asked Watson if Francis could post Plaintiff's position. Ex. H, at 82-83; Ex. A, at 73; Ex. HH. Watson replied, asking Thomas if Plaintiff had exhausted FMLA leave. Ex. H, at 83; Ex. HH. Thomas replied "yes," even though she knew that Plaintiff was not entitled to FMLA leave as a "Flex Casual" employee. Ex. H, at 84; Ex. A, at 86; Ex. HH. Watson then gave Francis permission to post Plaintiff's position. Ex. A, at 86; Ex. HH. Francis had no idea if Plaintiff was ever contacted by HR about this. Ex. A, at 87-89; Ex. HH.

Plaintiff was sent a termination letter dated January 10, 2018. Ex. H, at 97-98; Ex. II. The letter stated that, because The Hospital had yet to receive Plaintiff's medical certification, she was terminated. Ex. C, at 133. In the letter, Plaintiff's date of termination was January 2, 2018, the same date on which Thomas told Plaintiff that

Plaintiff was not terminated. Ex. H, at 73, at 103. Ex. A, at 93-94; Ex. JJ. The Hospital claims that it never received the documentation from Dr. Jackson.  The Hospital did not follow up with Plaintiff regarding the status of such information before terminating her employment.

Plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC") on April 18, 2018, alleging discrimination due to her sex and disability under Title VII, ELCRA, the ADA, and the PWDCRA. Ex. KK. On April 24, 2018, the EEOC issued a Notice of Right to Sue letter regarding her Charges of Discrimination.

## III.   LEGAL STANDARD

Rule 56(a) of the Rules of Civil Procedures provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).   The presence of factual disputes will preclude granting of summary judgment only if the disputes are genuine and concern material facts.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute about a material fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id*.  Although the Court must view the motion in the light most favorable to the nonmoving party, where "the moving party has carried its

burden under Rule 56(c), its opponent must do more than simply show that there is

some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co.*

*v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Celotex Corp. v. Catrett*, 477 U.S.

317, 323-24 (1986).  Summary judgment must be entered against a party who fails to

make a showing sufficient to establish the existence of an element essential to that

party's case, and on which that party will bear the burden of proof at trial.  In such a

situation, there can be "no genuine issue as to any material fact," since a complete

failure of proof concerning an essential element of the nonmoving party's case

necessarily renders all other facts immaterial.  *Celotex Corp.*, 477 U.S. at 322-23.  A

court must look to the substantive law to identify which facts are material.  *Anderson*,

477 U.S. at 248.

## IV.   ANALYSIS

### A.   Title VII/ELCRA Claims

Plaintiff has asserted claims for pregnancy discrimination under both Title VII

and ELCRA, and both claims are evaluated under the same substantive standards. *See*

*Latowski v. Northwoods Nursing Ctr.*, 549 Fed.Appx. 478, 483 n. 2 (6th Cir.2013)

(citing *Sutherland v. Mich. Dep't of Treasury*, 344 F.3d 603, 614 n. 4 (6th Cir.2003)).

Under the Pregnancy Discrimination Act portion of Title VII, discrimination because

of or on the basis of pregnancy, childbirth, or related medical conditions is defined as

a kind of sex discrimination and is prohibited. 42 U.S.C. § 2000e(k). Women who are affected by pregnancy, childbirth or related medical conditions are required to be treated the same, for all employment purposes, as other persons not so affected but who are similar in their ability or inability to work. *Id*. Similarly, ELCRA prohibits an employer from "discriminating against individuals on the basis of sex with respect to a condition of employment [,]" and "discrimination because of a woman's pregnancy is a form of discrimination because of sex." *Haynie v. State*, 664 N.W.2d 129, 133–34 (2003).

Under both Title VII and ELCRA, a "plaintiff bringing a[n] . . . employment discrimination claim must present either direct evidence of discrimination, or circumstantial evidence that allows for an inference of discriminatory treatment." *Reeder v. City of Wayne*, 177 F.Supp.3d 1059, 1079 (E.D. Mich. 2016) (citing *Johnson v. Kroger Co.*, 319 F.3d 858, 864-65 (6th Cir. 2003)). In this case, it is undisputed that there is no direct evidence of discrimination. "Circumstantial evidence . . . is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred." *Wexler*, 317 F.3d at 570.

Pregnancy discrimination cases are analyzed through the *McDonnell Douglas*[4]

---

[4]*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

burden shifting analysis. In order to show a prima facie case of pregnancy discrimination under Title VII, Plaintiff must show that "(1) she was pregnant, (2) she was qualified for her job, (3) she was subjected to an adverse employment decision, and (4) there is a nexus between her pregnancy and the adverse employment action." *Cline v. Catholic Diocese*, 206 F.3d 651, 658 (6th Cir. 2000); *Prebilich-Holland v. Gaylord Entertainment Co.*, 297 F.3d 438, 442 (6th Cir. 2002) (quoting *Cline*, 206 F.3d at 658).   It is well-established in the Sixth Circuit that the prima facie requirement in discrimination cases "is not onerous, and poses a burden easily met." *Cline*, 206 F.3d at 660.

If a plaintiff establishes a prima facie case, the burden then shifts to the defendant to articulate some legitimate, non-discriminatory reason for the adverse employment action against the plaintiff. *Grosjean  v. First Energy Corp.*, 349 F.3d 332, 335 (6th Cir. 2003); *McDonnell Douglas*, 411 U.S. at 805.  Once the defendant offers a legitimate, non-discriminatory reason for its conduct, the burden shifts back to the plaintiff to demonstrate that the defendant's stated basis for the adverse employment action is a pretext designed to mask discrimination. *Texas Dept. Comm. Affairs v. Burdine*, 450 U.S. 248, 253 (1981); *McDonnell Douglas*, 411 U.S. at 805. Pretext may be demonstrated if "the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to

warrant the challenged conduct." *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000). Plaintiff must show that the proffered reason is not credible and just a pretext for intentional discrimination. *Cline*, 206 F.3d at 657-58.

Defendants do not dispute that Plaintiff satisfies the first, second, and third elements. Defendants argue that Plaintiff cannot show a nexus between her pregnancy and her termination because she was terminated 10 months after announcing her pregnancy and 3 months after indicating she was suffering from post-partum complications. Defendants also assert that "the Hospital granted every pregnancy and disability-related accommodation she requested . . . [and] Francis, Rose, and Thomas "tried to communicate with her and ensure she was successfully able to extend her leave as needed and set up her return to work." ECF No. 21, PgID 101. Defendant contends Plaintiff was terminated only because she "failed to show up on her return to work date or otherwise communicate with management or Human Resources." *Id.* at 102.

Plaintiff counters that The Hospital (specifically, Thomas, the Leave Administrator) was only made aware of her pregnancy-related condition on November 8, 2017. Plaintiff's supervisors began to discuss posting Plaintiff's position on the same day, ECF No. 23, PgID 320; Ex. A at 70-71, talked again about posting the position the week of December 1, 2017, *id.* at 73, and tried to post Plaintiff's position

15

on or about December 20, 2017. *Id.* at 66-68.  On January 2, 2018, The Hospital did post for her position – and terminated her, immediately after Plaintiff told Thomas that Plaintiff had a doctor's appointment the next day for her condition.

The Court findd that Plaintiff has set forth evidence sufficient to create a genuine dispute of material fact as to whether The Hospital discriminated against Plaintiff because of her pregnancy-related condition.  First, Plaintiff was terminated less than two months after Thomas, The Hospital's Leave Administrator, learned of Plaintiff's condition, which can be evidence of a causal nexus. *See, e.g., See, e.g., Asmo v. Keane Inc.*, 471 F.3d 588, 593 (6 th Cir. 2006); *DeBoer v. Musashi Auto Parts, Inc.*, 124 F. App'x 387, 391 (6th Cir. 2005); *DiCarlo v. Potter*, 358 F.3d 408, 421 (6th Cir. 2004).

Second, there is evidence that Plaintiff consistently communicated with Francis, Rose, and Thomas, up to and including on January 4, 2017, about Plaintiff's condition, including sending numerous emails or faxes that contained leave requests and return to work forms from her physician's office. *See, e.g.,* ECF No. 23, Ex. A. at 41-42; Ex. C at 108, 121-22, 125, 127; Ex. H at 23-24, 45-47, 48, 53-56, 65-67; Ex. P; Ex. U; Ex. V; Ex. X; Ex. Y; Ex. Z; Ex. AA; Ex. BB; Ex. CC.  Third, it is undisputed that no one at The Hospital (including Rose, Francis, and Thomas) ever asked Plaintiff for a medical certification form, *id.* at Ex. C at 119; Ex. H at 53, 55,

even though Plaintiff's failure to submit one was an asserted basis for her termination.

The Court finds that Defendants have proffered a legitimate, non-discriminatory basis for Plaintiff's termination. Defendants claim that Plaintiff's termination was the result of Plaintiff failing to return to work or provide the necessary documentation to support an extension of her leave. It is undisputed that Plaintiff did not return to work or submit a medical certification form.

Plaintiff contends that Defendants' legitimate, non-discriminatory reason was mere pretext because their proffered reason had no basis in fact. Viewing the proposed evidence in a light most favorable to Plaintiff, the Court concludes that Plaintiff has submitted evidence to support a finding that there is a genuine dispute of material fact as to whether Defendants' legitimate, non-discriminatory reason for termination was mere pretext. First, although Plaintiff did not return to work on January 2, 2018, Plaintiff advised Thomas on or about that day that she had post-partum complications and had a doctor's appointment on January 3, 2018.

Second, as noted above, there is evidence in the record to show that, between August 2017 and January 4, 2018, Plaintiff (including by faxes sent by her husband) regularly communicated with Francis, Rose, Thomas and others at The Hospital about Plaintiff's pregnancy-related complications. Such evidence, if accepted by the fact finder, could disprove Defendants' contention that Plaintiff failed to communicate

with management or Human Resources at The Hospital.

Third, there is evidence that when Plaintiff emailed Thomas a Leave of Absence form on December 8, 2017, Plaintiff specifically asked Thomas, "Do I need to have the other packet filled out since my doctor has already provided a doctor's note?" ECF No. 23, Ex AA.  The "other packet" was the one that Thomas sent to Plaintiff that included the Department of Labor's medical certification to be completed by the employee's physician. *Id.* at Ex. H at 21.  Thomas, however, never responded to Plaintiff's question or otherwise asked for a medical certification form from Plaintiff in December or January when Thomas was communicating with Plaintiff regarding leave. *Id*. at Ex. H. at 53, 55; Ex. Z; Ex. AA; Ex. BB.

For these reasons, the Court denies Defendants' motion with respect to Plaintiff's pregnancy discrimination claim and submits that claim to the factfinder.

## B.    ADA/PWDCRA Claims

The standards for establishing a *prima facie* case for disability discrimination pursuant to the PWDCRA and the ADA are essentially the same and "claims under both statutes are generally analyzed identically." *Cummings v. Dean Transp., Inc.*, 9 F.Supp.3d 795, 804-05 (E.D. Mich. 2014).

> To establish a prima facie case for failure to accommodate under the ADA, a plaintiff must show that: (1) she is disabled within the meaning of the Act; (2) she is otherwise qualified for the position, with or without reasonable accommodation; (3) her employer knew or had reason to

know about her disability; (4) she requested an accommodation; and (5) the employer failed to provide the necessary accommodation.

*Judge v. Landscape Forms, Inc.*, 592 F.App'x 403, 407 (6th Cir. 2014) (internal citation omitted); *see also Burdett-Foster v. BCBS of Mich.*, 574 F.App'x 672, 680 (6th Cir. 2014); *DiCarlo v. Porter*, 358 F.3d 408, 419 (6th Cir. 2004); *Spiteri v. AT & T Holdings, Inc.*, 40 F.Supp.3d 869 (E.D. Mich. 2014). As part of this prima facie case, the plaintiff "bears the initial burden of proposing an accommodation and showing that that accommodation is objectively reasonable." *Kleiber v. Honda of Am. Mfg.*, 485 F.3d 862, 870 (6th Cir. 2007) (quoting *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 457 (6th Cir. 2004)).

Defendants argue that Plaintiff was given every accommodation she requested. Defendants state that The Hospital accommodated Plaintiff's request to: (1) reduce her schedule; (2) take a four-month leave of absence for pre-birth complications; and (3) extend her leave for an additional four months for post-birth complications. Defendants contend that: (a) those are the only three accommodations Plaintiff ever requested; and (b) Plaintiff did not request an accommodation to have her leave extended beyond January 1, 2018. Defendants also suggest that: (1) in the fall of 2017, they proactively took steps to find coverage instead of posting for Plaintiff's position to ensure that Plaintiff could return to the job on January 2, 2018 (her return to work date); and (2) The Hospital initiated communications regarding the extension

of Plaintiff's leave that ended on January 1, 2018 when Thomas called Plaintiff on January 2, 2018 after Plaintiff did not return to work at The Hospital that day (Plaintiff's return to work date). Plaintiff does not dispute that she did not initiate a request for extending her leave beyond January 1, 2018, but Plaintiff argues that she made a request for reasonable accommodation when she advised Thomas on January 2, 2018 that she was still on crutches, was going to her doctor the next day and would submit documentation after seeing her doctor.

Defendants assert that, even if Plaintiff can be said to have requested an accommodation on or about January 2, 2018, The Hospital sufficiently engaged in the interactive process. An employer's obligation to engage in the interactive process is triggered when an employee requests an accommodation. *Belasco v. Warrensville Heights City Sch.*, 634 F. App'x 507, 516 (6th Cir. 2015). "The law does not require a perfect interactive process, just good faith participation." *Kovac v. Superior Dairy, Inc.*, 998 F. Supp. 2d 609, 622 (N.D. Ohio 2014). If the process "fails to lead to [a] reasonable accommodation," then "responsibility will lie with the party that caused the breakdown." *Gleed v. AT & T Mobility Servs., LLC*, 613 F. App'x 535, 539 (6th Cir. 2015) (citing *Rorrer v. City of Stow*, 743 F.3d 1025, 1040 (6th Cir. 2014) (quotation marks omitted). An insufficient effort in the interactive process "is actionable only if it prevents identification of an appropriate accommodation for a

20

qualified individual." *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 766 (6th Cir. 2015) (internal quotation marks and italics omitted).

Plaintiff contends that The Hospital failed to initiate or maintain any interactive process with her, citing the fact that Plaintiff was never told to submit a medical certification form to start or extend her leave.  Plaintiff asserts that her doctor's note was sufficient to commence and continue her 2017 medical leave, and she was never told it was insufficient for obtaining medical leave.  Plaintiff acknowledges that the interactive process does not have to be perfect.  Plaintiff argues that The Hospital's "fail[ure] to give [her] instructions regarding extension" of her leave, together with ignoring her query seeking clarification regarding the need to submit a medical certification form, constituted a failure to meaningfully communicate with her, especially after Thomas told Plaintiff that Plaintiff was not being terminated on January 2, 2018 when her termination was effective that day.

Plaintiff counters that, even if an interactive process existed, the breakdown was caused by The Hospital's inattention to her leave, including as a result of The Hospital's failures attributable to the new leave software program, such that Plaintiff had no control over the leave process and did not receive the packet until December 2017.  Plaintiff claims that Thomas admitted that there was no interactive process with respect to Plaintiff's request for an extension of her leave. *See* ECF No. 23, Ex. H at

36-37. Citing *Rorrer v. City of Stow*, 743 F.3d 1025, 1041 (6th Cir. 2014) (failure to engage in the interactive process can constitute an independent violation of the ADA if the plaintiff establishes a prima facie showing that she proposed a reasonable accommodation).[5]  Plaintiff also cites The Hospital's requirement that she perform work (completing the LMS modules) as evidence that Defendants failed to accommodate her disability.  Finally, Plaintiff contends that Defendants failed to reasonably accommodate her disability when she was terminated, effective January 2, 2018, rather than having her medical leave extended. Citing *Walsh v. United Parcel Service*, 201 F.3d 718, 726 (6th Cir. 2000) (citing *Cehrs v. Northeast Ohio Alzheimer's Research Cntr*, 155 F.3d 775 (6th Cir. 1998)).

Defendants argue that, to the extent there was any breakdown in the interactive process, Plaintiff caused the breakdown when she failed to communicate with The Hospital after January 2, 2018. Citing *Gleed*, 613 F. App'x at 539 (plaintiff caused the breakdown in the interactive process when he did not communicate with his employer after being offered an accommodation).  Defendant notes that Thomas contacted Plaintiff on January 2, 2018, the first time the interactive process was necessary

---

[5]Defendants characterize as misleading Plaintiff's suggestion that Thomas admitted that she did not engage in the interactive process, as Thomas also testified that she meant only that she did not have an interactive process with Plaintiff until she got a request from Francis. ECF No. 21, Ex. 4 at 112-13.

because Plaintiff had been accommodated on all of her previous requests.  Because all leave had been approved through January 1, 2018, Defendant believes that January 2, 2018 is the only relevant date.  Defendant argues that, because Plaintiff did not return to work that day and had not communicated with anyone at The Hospital about extending her leave, Plaintiff was responsible for the lack of a leave extension. Defendants also claim that, even when Plaintiff's position was posted, she could have applied for it.

Defendants further argue that, even after Thomas initiated contact on January 2, 2018, Plaintiff: (1) never requested to extend her leave beyond January 1, 2018, (2) told Thomas on January 2, 2018 that Plaintiff did not know when she would return to work but was planning to see her doctor, and (3) never followed up with anyone at The Hospital after speaking with Thomas on January 2, 2018.  Defendants contend that, because Plaintiff did not know when she would return (and did not provide any follow up documentation after seeing her physician), Plaintiff was requesting to remain on indefinite leave, which is not considered a reasonable accommodation under the ADA. *See e.g. Maat v. Cty. of Ottawa*, 657 F. App'x 404, 412 (6th Cir. 2016) (quoting *Walsh v. United Parcel Serv.*, 201 F.3d 718, 727 (6th Cir. 2000)) ("an employer has already provided a substantial leave, an additional leave period of a significant duration, with no clear prospects of recovery, is an objectively

unreasonable accommodation.").

Viewing the evidence in a light most favorable to Plaintiff, the Court concludes that Plaintiff has established a prima facie failure to accommodate claim. All of Plaintiff's leave up to and including January 1, 2018 had been approved based on her physician notes and return to work forms. On January 2, 2018, even though it was at the initiation of Thomas, Plaintiff communicated to Thomas that she remained on crutches, was seeing her doctor the following day, and would follow up with documentation shortly, which she had her husband send to The Hospital on January 4, 2018. This conclusion is buttressed by the fact that Francis understood Plaintiff's January 2, 2018 conversation with Thomas and upcoming doctor's appointment as indicating that Plaintiff intended to extend her leave, ECF No. 23, Ex. A at 84.

For the reasons stated above with respect to the pregnancy discrimination claims, the Court also concludes that Defendants have proffered a legitimate, non-discriminatory reason for terminating Plaintiff and that Plaintiff has met her burden of showing that such reason was merely pretext. Accordingly, the Court denies Defendants' Motion for Summary Judgment with respect to the ADA claim (but not the PWDCRA claim, as discussed below).

Defendants argue that Plaintiff's PWDCRA claim is deficient because she did not make an accommodation request in writing that the Hospital refused to provide

it, as required under Michigan law. Citing *Aldini v. Kroger Co. of Mich.*, 628 F. App'x

347, 350 (6th Cir. 2015); *Hodnett v. Chardam Gear Co., Inc.*, 749 F. App'x 390, 396

(6th Cir. 2018) (citing MCL 37.1102(18)).   Defendants maintain that, because

Plaintiff did not submit a written request in January 2018 to extend her medical leave,

her PWDRCA claim fails as a matter of law. Citing *Cotuna v. Walmart Stores, Inc.*,

No. 14-10420, 2016 WL 5661572, at *3 (E.D. Mich. Sept. 30, 2016) (granting

summary judgment under the PWDCRA as to any requests for accommodation not

made in writing).

Plaintiff seems to suggest that she made a request for accommodation in writing

for leave after January 1, 2018 when her husband faxed Dr. Jackson's note to The

Hospital on January 4, 2018. *See* ECF No. 23, Ex. C at 130.  The only evidence that

Mr. Holly faxed these materials to The Hospital is his affidavit averring to that fact.

There is no fax confirmation sheet and there is no dispute that January 4, 2018 was the

earliest "written" request for accommodation by extending her medical leave that

Plaintiff submitted to The Hospital.

The Court finds that Plaintiff failed to sufficiently establish facts to support a

PWDCRA claim because: (a) there is no evidence of a written request for

accommodation by extending her medical leave; and (b) even if Mr. Holly's fax

constitutes such a written request, it was not made until January 4, 2018, two days

after Plaintiff was due back at work.  Accordingly, the Court grants Defendants'

Motion for Summary Judgment on – and dismisses – the PWDCRA claim.

## V.        CONCLUSION

Accordingly,

IT IS ORDERED that Defendants' Motion for Summary Judgment [ECF No.

21] is GRANTED IN PART and DENIED IN PART.

IT IS FURTHER ORDERED that the Motion for Summary Judgment is denied

with respect to Plaintiff's Title VII and ELCRA claims based on pregnancy

discrimination and Plaintiff's ADA claim.

IT IS FURTHER ORDERED that the Motion for Summary Judgment is granted

with respect to Plaintiff's PWDCRA claim.


Dated: April 28, 2023                    s/Denise Page Hood
                                         DENISE PAGE HOOD
                                         UNITED STATES DISTRICT JUDGE